And we will now hear argument in the final case of Salgado v. Yarborough. Mr. Levy, how much time would you like reserved? May I have five minutes? Five minutes, okay. Judge Smith, thank you. Okay. Good morning. My name is Richard Levy for the appellant Salgado. This is the habeas case involving a jury instruction and juror misconduct. On the instructional error, this case turns on the missing word only. The magistrate judge reasoned that there was no error because the jury was instructed that first-degree murder occurs only with express malice. But as the State acknowledges on page 24 of the brief, the instruction, the word only, doesn't even appear in the instruction. The jury was never told that premeditation is the only way to get to first-degree murder. Now, there's two ways to deal with this problem. One way, which is the way that the new CalCRM instructions take, is you say what is, what are the ways to get to first-degree murder, and everything else is second-degree murder. So it's the... We have another problem. The facts of how these murders took place are not disputed. That's true. They're not disputed, Judge Ferris, in the sense that both sides focused their arguments on express malice and premeditation rather than on implied malice. But I'd point out that in this circuit's Lohr v. Ryan case, there was also, that case also involved shots that were point blank. How could the murders in this case have confused a jury into thinking that this was second-degree murder? I mean, have confused the jury into thinking that what clearly the facts clearly suggest was second-degree murder was first-degree murder? Was there any doubt about what happened? Oh, yes. Well, let me get to... There was no doubt about it. With one person three times in the face, isn't that what happened? Look at Lohr v. Ryan. Lohr approached Ortiz and aimed the gun between his eyes and shot twice. Yes. He aimed the gun at Varela's temple and shot Varela just as Varela was able to struggle. Those are point blank shots. And yet this court, in Lohr v. Ryan, was not able to say, we're certain that the jury did not find implied malice murder. The only way Lohr was able to save the conviction was by saying, aha. In another finding, the jury found premeditation for which it was instructed that expressed malice was required. So given that finding, the jury must have found expressed malice. But a point blank shooting is not necessarily intent to kill. And I would cite, if I may, Judge Ferris. No, no, no.  Okay. Thank you. So you have the residual rule of CALCRIM. Premeditation is first degree. Felony murder is first degree. Whatever. Everything else is second degree. The CALGIC, which is what this, the old CALGIC instructions, which was on this case, take a different approach. CALGIC looks at each possible culmination and says, this is first degree. You have that. It's second degree. For example, if you have expressed malice and premeditation, that's first degree. If you have expressed malice and no premeditation, that's second degree. And so on. All the combinations. That works fine as long as you make sure you list all your culminations. And the problem here is the judge omitted CALGIC 8.31, which would have listed the final culmination, implied malice without premeditation. That instruction would have said, hey, that's second degree murder. But the jury was not told that. So they were left with the possibility, they were allowed to find an invalid theory of implied malice and first degree murder. And as I say in the brief, it's not really a stretch because jurors may not realize that first degree is a term of art. It could be like burns. You have first degree burn, second degree, third degree. Jurors may think, well, we're not sure it's premeditated and we're not sure he aimed to kill. But, wow, when you have a gang member and, you know, you shoot these kids at a party, that's like a third degree burn. We're going to say, we're going to set this degree at first degree. And they don't know that you can't do that. Mr. Lee, how would you respond to the point that there was no reasonable likelihood that the jury convicted Salgado for first degree murder on a finding of implied malice? In my notes here, at the trial, the State presented a lot of evidence that the shootings were deliberate and manifestly intended to kill. Implied malice was never argued by either party. The jury instructions never affirmatively suggested that implied malice is the basis for a first degree murder conviction. What's your take on that? That would go to this Court's recent case of Pulido v. Crohn's. No matter how unlikely it is that the jury relied on the invalid theory, unless you can say with certainty, which requires some kind of separate independent finding, then that's not good enough. And here, as the quote from Law Against Crime points out, there's nothing unusual or on its face invalid about shooting someone even in the face and still having a question whether it's intent to kill. And the California Supreme Court, in fact, has pointed out that you can't necessarily presume an intent to kill from the aiming and firing of a gun. And that's – I don't believe I cited in the brief, but if I may, it's people against Ratliff, 41 Cal 3rd, 675 at 695. Of course, when you shoot someone three times in the face, that's – that survives substantial evidence and goes well beyond that. And you might even have a Chapman error problem trying to argue that that was harmless. But under Pulido v. Crohn's, it's not a question of harmless error. It's a question of you must be absolutely certain. And that's – that's – there's no way to do that in this case. I'm interested in at least what I think is perhaps your better argument, which is the failure to hold a full evidentiary hearing regarding the allegations of juror misconduct from juror number five. I refer particularly to Remmer v. United States and Smith v. Phillips. Would you care to comment on that? Yes, Judge Smith. As the Judge Posner's Second – Seventh Circuit opinion points out, which I rely on a great deal in the briefs, even on habeas under the AEDPA standard, even if the State holds some kind of hearing, that could be unreasonable and insufficient under AEDPA. And the reason that's the case here, we know that the Court held some kind of hearing. It had affidavits, sworn affidavits, by both sides. The critical point here, though, is number five's claims were in significant portion substantiated, corroborated by the other jurors, especially the foreman's statement. So how can you say – The critical points were substantiated. Not the critical points, except that the foreman did say – the foreman told the defense investigator, Judge Ferris, that he did look to where the Fernandez murder occurred while he was attending the tennis match. And in his DA declaration, even though he backed off from that, which you may be referring to, he admitted that they also talked about the darkness as a reason that the defendant could not be ID'd. Now, when you put those two together, in his defense investigator statement, he says, yeah, I did take a look. And in his DA statement, he says, and our issue was, why wasn't anybody able to ID them? Was it because it was dark? That is very powerful corroboration of what number five was saying. I'm interested in your take on the following. One of the benefits of seeing live testimony is an ability to observe the demeanor of the witnesses and the like. Obviously, the judge did look at what evidence he had on it, but basically it was the written evidence, as I understand it. How important is it in this type of situation where there is at least some evidence that suggests that juror number five was telling the truth as to some part of that? How important is it that the judge be able to observe the demeanor of number five and number two and so on, if at all? It's critical, Judge Smith, and I would rely on what the Supreme Court said long ago in a case I cited in the reply brief, Blackledge v. Allison. Quote, when the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive, unquote. And I think that's just common sense, as I think your question is. I would assume we would agree with that holding, but here there's more than just affidavits. There's the action of juror number five in regards to the accused. Yes, Judge Ferris. And there's no dispute about it. There are the letters being written. There's money being deposited to the account. There's no doubt that for some reason there was some, some, something between juror number five and the accused. Yes. The question, the question I would put, Judge Ferris, is why was there something? The State judges along the line generally — Well, we'll never know from this record. Oh. But he — but number five did say to, I believe, the prosecutor-investigator that he, he befriended Salgado because he believed he got a wrong, raw deal, that he was innocent or at least could not be proved wrong because of that. Yeah, we know what he said, but I said we'll never know. That's true. That's true. And if number five had been put on the stand, examined and cross-examined where you could look at his demeanor, we'd still never know, but we'd have at least a better basis for — Couldn't a judge — you tell me. Couldn't a judge realistically decide based on what he did know that there was no need to go further? I'd say no for two reasons, Judge Ferris. One is number five — we know that number five was corroborated in some measure. So it's not like he said one thing, everyone else said something else. He has a bias, therefore we can toss it out of hand. There are a number of jurors, and I go over it in the brief, corroborate in significant part some of these key points. The second point is I think it's jumping to conclusion to say he befriended the guy for some reason and therefore he was biased. I think it's equally plausible to say — I'm not saying he's biased. I'm saying what the judge would have said. Yeah, I understand what you're trying to say. We don't decide the issue. He was — you could equally say he was so concerned that the guy got a wrong deal, given the jury — the antics in the jury room, that that's why he befriended him, and that's why he decided to go further. We would have — we would be better able to find that out by a full evidentiary hearing where number five has never been put on the stand under oath. He was questioned in voir dire, of course, under oath, but that's an entirely different context. Here — Does time make a difference in this case? Time makes a difference in the remedy, Judge Ferris. In one case, I believe it's the Simtob case, this court remanded for a further Remmer hearing. I believe that was because that's what the defense requested, rather than a complete retrial. Here, you know, it's been, I believe, seven, six or seven years since trial. The incidents were in 94. What matters is the time to trial. I don't think it's feasible to track down the jurors and bring them back and — So you're saying the Remmer hearing doesn't really help you here. You're asking for a new trial. Yes, but the reason for the new trial, as in the Judge Posner case, is the insufficiency of the Remmer hearing. Judge Posner never said there was misconduct here, although he hinted strongly. I believe that the Oswald against — his Oswald case was the hearing was insufficient, so we're going to grant a new trial. And that would make sense, given the passage of time, which I think you were referring to, Judge Ferris, although I do have to point out, as I say, the Simtob case takes a different tack. The State concedes that it is a, quote, rare instance, unquote, when a full evidentiary hearing is not required. That's at the government brief at page 40. And I assume full evidentiary hearing, I assume they mean with cross-examination, live testimony and so on. I don't see how you can say that this is one of those rare instances where you can dispense with that and just decide the case based on the affidavits, given the partial corroboration of number five, not by just one juror, but several jurors, if you look at them all, each one has a little different piece of it. And especially when you look at the foreman, how he contradicts himself from the D.A. declared declaration, it seems to me that's pretty powerful evidence that he realized he spoke the significance of the truth. And so he had to have a different record. But I think the foreman denied almost everything that was attributed to him, except he said when he went to take his daughter, wherever he took her, he did look over at the site of the murder. Well, he did say to the defense investigator that, quote, something was said, unquote, about having to tell Fernandez's parents of a deadlock and about the cost of a retrial. So that's also partial corroboration. And then he backed them. Mr. Levy, you may want to reserve the rest of your time. We've got 4.26 right now. Do you want to do that? I will if I've answered. Yes. Okay. Very good. Let's hear now from the government. Sorry I didn't catch it at the 5 minutes, but your colic we was so interesting, we didn't want to do that. Good morning. May it please the Court. Lisa Jacobson, Deputy Attorney General for the Respondent. The California Court of Appeal reasonably rejected Appellant's instructional error claim and his jury misconduct-related claims. First, with respect to the instructional error, Appellant analyzes this as under predecessors. The trial court, as this Court noted, did not expressly instruct the jurors that it could find Appellant guilty of first-degree murder under an implied malice theory. The only way the jurors could have gotten to that would be if they disregarded the Court's instructions on premeditation and deliberation and assumed that an implied malice murder, that is a reckless murder, could be first degree, even though they were expressly instructed that an expressed malice murder without premeditation would only support a finding of second-degree murder. And that distinguishes this case from Lara. Also in Lara, the prosecutor relied upon implied malice instruction in closing argument, and here, as this Court pointed out, this case was prosecuted as a first-degree premeditated murder case, and the defense counsel even conceded the applicability of this theory, and the evidence was overwhelming. Not only did Appellant shoot one of the victims in the face three times, he also told the police that the reason he shot him in the face three times was a payback for an earlier killing. And with respect to the Fernandez count, we have those three convictions for attempted premeditated murder. I don't think – well, you know the record better than I do, but I think what he was talking about was why he killed him. Yes. He killed him – why he killed Artiga was a payback, which I think – Yes, was a payback. Sure. And he did kill him by shooting him three times in the face, but – I was trying to – my point was that his statement to the police further establishes that that killing was intentional of Artiga. And with respect to the Fernandez murder, we have those three counts of attempted premeditated murder that – and those killings occurred during the same transaction in which Appellant fatally shot Fernandez. So in light of this Court's comments about the instructional error claim, I'd like to move on to the misconduct claim, unless there's any questions. You mentioned a minute ago, I think, that the DCA in California decided the issue that we're just talking about now, juror number five. Is there a citation on that? Excuse me? In other words, the jury misconduct claim. Did I understand you to say that the California Court of Appeal had decided under state law considerations that there was no jury misconduct? No, Your Honor. I said – I misunderstood. I perhaps misspoke, but my argument is that the California Court of Appeal reasonably rejected Appellant's jury misconduct claims. Okay. So as to the failure – Said reasonably, not recently. Correct. That's where I misunderstood. As to the failure to hold a full evidentiary hearing, this is one of those rare cases. We had four things here that were really unusual. First, we had the letters, copies of the letters that Salgado and juror number five exchanged. We have 20 letters in the record. And juror number five, after they reached a verdict, he went home and started writing Salgado's letters. And I would invite this Court's attention to three letters in particular. The first is a letter that Salgado wrote to juror number five on December 4, 2002, in which he talks about how his attorney was going to talk to some of the jurors to see how they reached a verdict and see if anyone had prejudged the case. And in this letter, and at this time Salgado doesn't know juror number five's identity, Salgado writes, All I really need is for one juror to say how others felt. In a December 13 letter, juror number five asks Salgado about the progress of the juror investigation, and he also tells Salgado, apparently in response to Salgado's question, about why I write to you. I really don't know. I guess I find you intelligent and an interesting person, and I'm not here to judge you for the past because I don't know you then. And then on January 16, juror number five encouraged Salgado to pray and wrote, Remember, Steve, your prayers did work. One of them speak up in a mysterious way, which is obviously referring to one of the jurors did speak up. Additionally, the trial court had before it evidence that juror number five twice tried to distance himself from the original allegations. First, in that letter he wrote to defense counsel where he said he wasn't in his right state of mind when he wrote the initial letter alleging misconduct, and that defense counsel could not use that letter for any purpose. And then again we saw it when Salgado was interviewed by the district attorney's investigator in which he explained away many of his allegations of misconduct. And finally, the trial court had before it the declarations of ten other jurors, which showed that juror number five essentially stood alone in many of his attempts to or in his attempt to impeach the verdict, and that many of his allegations were not corroborated whatsoever. So under the AEDPA, we have to look to see what the Supreme Court standard is, and this court has recognized that the Supreme Court has set forth a flexible rule and that when an evidentiary hearing is required, due process does not require any particular type of hearing be held. And I think under AEDPA, the California Court of Appeal reasonably applied Supreme Court precedent in rejecting appellant's claim that a full evidentiary hearing with live witness testimony was required. As to the merits of, oh, and one other point on, excuse me, on the failure to hold a full evidentiary hearing, appellant in his reply brief says the state concedes that this case is similar to Oswald, or we acknowledge that this case is similar to Oswald. Not at all. Oswald involved a notorious crime, the most notorious crime in the area in 20 years in that county, a father-son bank robbery, and part of their attempted escape was captured on videotape, and in that part the hostage escaped. And in that case they had 156 jurors in the pool, potential jurors in the pool, and on day four when they had whittled it down to 29 or around day four, one of the prospects said, hey, I learned more about this case in the past three days than I have known since the crime was committed, and there's really no need for a trial. But rather than examining all the prospective jurors that were still there, the court limited the examination to the three prospective jurors that had not been vordeered and to one speaking with one bailiff. Here, of course, we heard from 11 jurors, and the court had before it ample evidence to support its factual finding that juror number five was, in fact, biased in favor of Salgado. So this case is easily distinguishable from Oswald. As to the merits of Appellant's juror misconduct claims, the California Court of Appeal reasonably determined that both the alleged crime scene visit, which was really just attending his daughter's sporting event at a high school across the street from the Southside Gang Hangout House, where Appellant's presence at which that house was not even disputed, and the criminal histories discussion, the California Court of Appeal reasonably determined that neither were prejudicial because after both topics were discussed, another juror said, hey, we can't talk about this. So the record supports the California Court of Appeal's determination that the jurors were solicitous about following the court's instructions, including the court's instructions to decide the case based on the evidence before it. The record also supports the California Court of Appeal's determination that juror number two never made the electric chair comment or the comment about Appellant going down and that the case would only take 10 minutes to deliberate because there were no other, there was no corroboration that juror number two, in fact, made these statements. And finally, as to the Fernandez family and the cost of a retrial comments, the California Court of Appeal reasonably determined that no prejudice ensued in that for the reasons set forth in the opinion. So unless this Court has additional questions for me, we would submit on our brief. I don't think so. Thank you very much for your presentation. Mr. Levy, you have about four and a half minutes, four minutes and 23 seconds to be explained. Thank you, Judge Smith. The State says, distinguishes this from Judge Posner's case because in this case, quote, we heard from 11 jurors. Uh-oh, we didn't hear from 11 jurors. We read DA-prepared declarations from jurors. That is a whole lot different from hearing live testimony. And, again, I'd point to controlling Supreme Court authority, black-legged espousal. Is there any evidence, Mr. Levy, that the jurors, whoever prepared the declarations or statements, perjured themselves? We don't know. We don't know. I mean, we're not in a position to say. We know that someone is either misrecollecting or lying, but we don't know which, and we don't know which side until we look at the other. We know what the trial court assumed. We know what the trial court assumed, right. They assumed that juror number five was the highest juror. Right, right. Is government counsel correct that under the AEDPA standard that there's no specific type of hearing required and that the district court consideration of these various declarations sufficiently complied with AEDPA? The hearing, there's no specific level of hearing required a fortiori, but the hearing has to be sufficient under the circumstances, and that would be the dire against this Court's dire against Calderon case, 151F3970. The question is, is it sufficient under the circumstances to read DA declared declarations and then jump to the conclusion, oh, number five must be wrong because he has a bias, and not pay attention to the foreman's backtracking, not pay attention to the corroboration, and so on. I think Remer requires something more than a pro forma hearing. Are you suggesting when you say DA declared, I don't know that you are suggesting what you may be suggesting. I think were the declarations signed by the jurors? Oh, yes. I'm not suggesting, Judge Ferris, that the DA manufactured them, but they were written and signed under the DA's guidance and supervision, and I'm sure the DA let them know, if they didn't know already, that all their hard work is going to be put to naught if a new clause is made. Be careful. You don't want to go further than you have to go. Okay. Okay. You don't know what the DA said, do you? No, but I think we know that the jurors would have understood. You're assuming. Right, sure. Sure, Judge Ferris. Going back to the instructional issue, the instructions did say express malice without premeditation is second, but the key is the instructions never said implied malice without premeditation or implied malice with whatever is second and can't be first. That's the key problem. That's why 8.31 Calgic is there. That's why it's required. And if you don't give that instruction, you have a big hole, and you don't know how jurors are going to go through that because they may not understand the significance the way lawyers would. And, again, if I could use up my remaining time to point out the key thing, the State keeps arguing prejudice. I can concede readily neither side argued implied malice. They conceded it was premeditation. That doesn't matter any more than it mattered in Laura against Ryan in the Pulido case. Laura, where the guy was shot point blank several times in the temple. It's not enough to say this is harmless. It's not enough to say it's highly unlikely that the jury went that route. You have to be able to say with absolute certainty, and that is a burden that has not been met because, as in Pulido and unlike Laura, there's no jury finding that allows you to say, aha, because they found this, they must have found, they absolutely had to find the other thing. Okay. Thank you, Judge Smith. Thank you both for your able advocacy. The case of Salgado v. Brough. I'm sorry. It's the warden here. Yarborough is submitted. And this Court is in recess. I know we finished, and I'm agreeing that we finished, but nothing in this record says what the basis of the friendship and the attraction between juror number five and the others. Do the letters make that clear? I'd ask the Court to look at page 64 of the supplemental excerpt of record, the letter written on that day. Do I hear you? It's declaration. It does say, although the letter doesn't. Yes, I understood that. Thank you all. Thank you.
judges: Farris, Smith, Holland